# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

ABDUL HOWARD,

    *Petitioner*,

vs.

SHERYL FOSTER, *et al.*,

    *Respondents*.

2:05-cv-01269-RCJ-GWF

ORDER

This habeas matter under 28 U.S.C. § 2254 comes before the Court for decision on the merits.

### *Background*

Petitioner Abdul Howard seeks to set aside his 2003 Nevada state court conviction, pursuant to a guilty plea, of two counts of robbery with the use of a deadly weapon.

Petitioner alleges, *inter alia*: (a) in Ground 1, that he was denied due process when the state district court allegedly improperly intervened in the plea negotiations; (b) in Ground 2, that he was denied effective assistance of counsel when counsel failed to pursue his *pro se* request for a continuance to contact more witnesses for trial, allegedly coerced and manipulated him into accepting a plea, and failed to interview petitioner's witnesses, conduct any legal research, or review any records; and (c) in Ground 3, that he was denied due process and effective assistance of counsel when the state district court allegedly did not canvass him properly during the plea colloquy.

The state court record materials on file reflect the following.

On January 3, 2003, Howard was charged by criminal complaint with, *inter alia*, burglary while in possession of a deadly weapon and robbery with the use of a deadly weapon arising out of a December 9, 2002, incident at a Smith's Food King in Las Vegas, Nevada together with burglary while in possession of a deadly weapon and robbery with the use of a deadly weapon arising out of a December 11, 2002, incident at a Las Vegas Wendy's.[1]

At the January 17, 2003, preliminary hearing, the State's presentation included the following evidence.[2]

Ellen Crespin testified as follows. She was employed as a change person by Anchor Gaming, and she worked in the company's slot machine area in the Smith Food King at 850 South Rancho in Las Vegas. At about 10:00 p.m. on the evening of December 9, 2002, a man whom she did not immediately recognize came into the slot area requesting a dollar bill for change. The slot machines would accept only bills. The man played the dollar in a machine and then came back and asked to borrow a cigarette. After that, he went and talked to a number of grocery store employees, and he received a check from a store employee.[3]

The man came back over to the slot area, and Crespin asked him whether he worked there. He responded: "Yeah, I quit two weeks ago. I'm Leslie. Don't you remember me? You used to give me a dollar to take out trash." Crespin then recognized him. They talked about whether he was going to cash his check at the store, and he then walked away.[4]

The man then returned and asked Crespin whether she could break a hundred dollar bill. When she opened the cash drawer, he opened his shirt or jacket and showed her what

---

[1] #12, Ex. B.

[2] #12, Ex. C. The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes same solely as background to the issues presented in this case. No statement of fact made in describing statements, testimony or other evidence in the state court constitutes a finding of fact by this Court.

[3] #12, Ex. C, at 4-5 & 8.

[4] *Id.*, at 5 & 8-9.

1  appeared to her to be the barrel of a gun sticking out from his waistband.  She acknowledged
2  on cross-examination that the object possibly could have been a narrow metal pipe or some
3  other object.  The man said:  "Give me the money."  She kept saying that it was bull____
4  because she had been held up two weeks before.  She said to the slot machine players that
5  "Look, he's holding me up," but no one looked up from the machines.  Crespin stepped back
6  and let him take money from the cash drawer, because she did not want to get shot.[5]

7       As the man left, Crespin yelled: "Leslie just robbed me, Leslie just robbed me."[6]

8       Crespin positively identified Howard as the perpetrator at the preliminary hearing.[7]

9       Crystal Sanders-Oien testified as follows.  She was employed as a manager at the
10  Wendy's at the corner of Las Vegas Boulevard and Cheyenne in Las Vegas.  During her shift
11  on December 11, 2002, she was called to the drive-through window because a customer had
12  asked to talk to the manager.  When she reached the window, a man at the window said that
13  a cashier had given him problems earlier and that he wanted to give his money directly to a
14  manager.[8]

15       Sanders-Oien positively identified Howard at the preliminary hearing as the man at the
16  drive-through window.  Howard was standing at the drive-through window outside of a box-like
17  moving van or truck because the vehicle was too high for the window.  Sanders-Oien believed
18  that the vehicle had been a Penske truck, but she was not sure.  Howard was wearing a white
19  short-sleeved shirt.  She asked Howard what he had ordered, and then she told him that the
20  bill was $4.12.  He handed her 15 cents, and she turned to place the money on the counter
21  without opening the register.  As she had turned to the counter, Howard had leaned over into
22  the van or truck.  As she turned back to the drive-through window, Howard had retrieved a
23  rifle, which he was pointing into the restaurant through the window. #12, Ex. C, at 19-27.

24  _____

25     [5]#12, Ex. C, at 5-7 & 9-15.

26     [6]*Id.*, at 7.

27     [7]*Id.*, at 6.

28     [8]*Id.*, at 17-19.

1    Sanders-Oien tried to close the drive-through window, but the barrel still was pointing

2    through the window, so she ran.  Howard reached through the window and pulled the cash

3    box with the money drawer out of the wall.[9]

4    When Sanders-Oien came back to the drive-through window after Howard was gone,

5    she saw that he had left the rifle.  It was inside the restaurant on the floor by the drive-through

6    window.[10]

7    She did not get a license plate number for the truck, but the customer in the vehicle

8    behind Howard's vehicle in the drive-through lane did get the license number.[11]

9    The police investigative reports further suggest that the following additional evidence

10   would have been available to the State if the matter had gone to trial.

11   At the December 9, 2002, Smith's incident, the Anchor Gaming surveillance video

12   system recorded the perpetrator both prior to and during the robbery.  On December 11,

13   2002, the police showed stills from the surveillance video to Fatima Benson, the emergency

14   contact on "Leslie Long's" employment application at Smith's.  Benson immediately identified

15   the person in the still photos as her brother, Leslie Long, and she told the police that he also

16   used the name Abdul Howard.[12]

17   A national criminal records check also reflected that Leslie Long was an alias for Abdul

18   Howard.  When the investigating officer later received a booking photo from the Fulton

19   County, Georgia Sheriff's Office, the photo looked similar to the still photos of Long.[13]

20   Lamarc Benson stated to the investigating officer that his uncle, Leslie Long, referred

21   on December 9, 2002, to "going to the 'Smith's one day, rob a woman, and take her money,

22   and try to run for it.'"  #12, Ex. A-1, Arrest Report, at 5.

23

---

24   [9]#12, Ex. C, at 21-23.

25   [10]*Id.*, at 28.

26   [11]*Id.*, at 23.

27   [12]#12, Ex. A-1, Arrest Report, at 4.

28   [13]*Id.*, at 4 & 5.

1    Fatima Benson called the police later on December 11, 2002, and said that Howard

2    was at her residence.  When the officers arrived, Howard fled, avoiding capture.[14]

3    The investigating officer took the Fulton County booking photo and constructed a photo

4    lineup.  When he showed the photo lineup to Ellen Crespin on December 11, 2002, she

5    immediately selected the photo of Howard.  According to the police report, she said that she

6    selected his photo because she knew the person in the photo as Leslie Long and that he was

7    the person who robbed her two days before on December 9, 2002.[15]

8    On December 12, 2002, the investigating officer learned that a Penske rental truck had

9    been stolen and that the truck had been used in the December 11, 2002, robbery at the

10   Wendy's.  The perpetrator at the Wendy's robbery was described as a black male wearing

11   a white t-shirt and black pants.  Another witness identified by Fatima Benson, Jessica

12   Shelton, stated to the investigating officer that Howard had come by her apartment on

13   December 11, 2002, that he was driving a yellow rental truck, which was consistent with the

14   coloring on a Penske rental truck, and that he was wearing a white t-shirt and dark pants.[16]

15   The Wendy's surveillance system also recorded images of the perpetrator from the

16   December 11, 2002, robbery.  It appeared to the investigating officer that the person in the

17   Wendy's surveillance video was Abdul Howard and that the individual looked similar to the

18   suspect in the December 9, 2002, Smith's robbery.[17]

19   / / / /

20

21   [14]#12, Ex. A-1, Arrest Report, at 5-6.

22   [15]*Id.*  In his federal reply, petitioner points to the fact that Crespin indicated in her voluntary statement
to the police that the perpetrator was 5'7" tall.  *Id.*, at 13-14.  He asserts in the unsworn reply that he instead is
23   6'0" tall. #20, at 4.  The arrest report, however, reflects that Howard is 5'10" tall.  #12, Ex. A-1, at 1.  In any
event, whether the difference was five inches or instead only three inches, estimation of height and weight by
24   lay eyewitnesses literally is not an exact science.  Petitioner was identified by a witness in this instance who
knew him personally.  He further was caught on surveillance videotape at both robberies, and he was
25   positively identified by two witnesses at the second robbery.  Petitioner has presented no claim in state or
federal court that turns directly upon the inaccuracy of Crespin's estimate of his height.  In all events, viewed
26   objectively, it is not a matter that would prompt a defendant to choose to go to trial rather than enter a plea.

27   [16]*Id.*, at 5 & 6.

28   [17]*Id.*, at 5.

-5-

1    On December 23, 2002, the investigating officer showed a photo lineup to Rickisha

2 Lawrence, a Wendy's night manager who also had been present at the December 11, 2002,

3 robbery.  Lawrence "studied the photos for a few minute[s], then selected the photo of

4 Howard."  She stated that she "based her selection on facial features and on the fact that she

5 got real nervous when she saw the photo of Howard."[18]

6    On December 30, 2002, police officers, acting on a tip, again encountered Howard.

7 He once again ran, but he was unable to avoid capture a second time.[19]

8    When Howard was questioned by the investigating officers, he stated that he wanted

9 to have an attorney present before talking about the Smith's robbery.  The police honored this

10 request and were terminating the interview.  Howard, however, reinitiated the discussion by

11 asking the officers questions and making comments.  Thereafter, Howard would state that he

12 wanted counsel, the police would proceed to terminate the interview, and then Howard

13 repeatedly would unilaterally reinitiate the conversation with further questions or comments.

14 During this back-and-forth sequence with Howard himself keeping the discussion going, he

15 stated at one point with regard to the Smith's and Wendy's charges, without any question

16 being asked: "OK.  Cause I, I know that's all I did.  Oops, that was a mistake."[20]

17    / / / /

18

19    [18]#12, Ex. A-1, Arrest Report, at 6.

20    [19]#12, Ex. A-1, Arrest Report, at 6.

21    [20]#12, Ex. A-2.  It appears that Howard made further unsolicited inculpatory statements when he was
apprehended.  Moreover, it appears that when he was caught, he had an object -- a remote control for an
22 electronic racetrack -- that resembled a gun along with a note that said "I have a gun don't make me kill."
See #12, Ex. H, at 9.  Petitioner asserts in the federal reply – in a rebuttal to the respondents' statement of
23 the facts – that the statement described in the text should have been suppressed because he was
"thoroughly inebriated off drugs" given to him by the medical staff that treated him for the injuries that he
24 sustained when the police forcibly apprehended him after he fled. #20, at 3.  The medical records attached
with the reply reflect that petitioner was given Tylenol No. 3, a combination of the otherwise nonprescription
25 analgesic acetaminophen with the prescription pain medication codeine. #20, Ex. 7.  At the time that he
entered a plea, a motion to suppress the statement was pending.  The motion noted that the questioning had
26 occurred while petitioner was being treated at the hospital, but the motion did not argue that petitioner was
inebriated on drugs. #12, Ex. I.  Petitioner presents no claim on federal habeas review that turns directly on
27 these matters.  He entered a plea without waiting for a ruling on the motion to suppress.  The possibility that
the motion to suppress would be denied and that the statement would be admitted into evidence was part of
28 the situation facing Howard when he opted to enter a plea.

-6-

1    In February 2003, Howard was charged with the robbery and burglary offenses by
2  information in the state district court.[21]

3    In May 2003, the State filed a motion to admit other crimes evidence.  The State
4  sought to admit evidence of Howard's alleged theft of the Penske truck on the basis that the
5  theft of the truck was relevant to proof of identity in the Wendy's robbery.  The State further
6  sought to admit evidence of a December 2, 2002, sexual assault, as to which Howard entered
7  a guilty plea to coercion with force, in order to establish his motive for the robberies.  The
8  State asserted that he went on the run after the sexual assault and that he committed the
9  robberies so that he could stay on the run.[22]

10    In May and June 2003, the defense filed a motion to sever the Smith's counts from the
11  Wendy's counts and a motion to suppress the petitioner's statement to the police.[23]

12    Howard's case came on for a calendar call on Thursday, June 5, 2003, with the case
13  set to go to trial four days later on Monday, June 8, 2003.  At the calendar call, the state court
14  noted at the outset that the pending motions remained to be resolved.  Defense counsel
15  advised the court, however, that a plea offer had been made by the State that was under
16  consideration.  As further elaborated upon *infra*, the state court and counsel engaged in an
17  on-record discussion in Howard's presence of the possible parameters of a plea deal.
18  Defense counsel then advised the court that Howard wanted to present a matter to the court.
19  Howard orally requested a continuance to obtain unspecified witnesses, and the state court
20  denied the request.  The court then broke for a recess.[24]

21    After the recess, defense counsel informed the court that Howard had accepted a plea
22  offer from the State.  A written plea agreement was prepared and executed, and, following
23  an oral plea colloquy, the state district court accepted the plea.  Howard pled guilty to the two

24  _____

25    [21]#12, Ex. D.

26    [22]#12, Ex. E.

27    [23]#12, Exhs. G & I.

28    [24]#12, Ex. K, at 2-6.

1   charges of robbery with the use of a deadly weapon and thereby avoided his potential
2   additional exposure on the two charges of burglary while in possession of a deadly weapon.[25]

3   It appears that, less than a week later, Howard filed a *pro se* motion to withdraw guilty
4   plea. He alleged that his defense counsel had refused to argue the defense motions and that
5   he therefore had been forced to enter a plea.[26]

6   The state district court appointed different counsel for Howard on the motion, and
7   counsel filed a counseled motion to withdraw on different grounds, which are discussed
8   further *infra*.[27]

9   On November 6, 2003, the matter came on for hearing on the motion to withdraw plea
10  and for sentencing. After hearing argument, the state court denied the motion to withdraw,
11  and the court sentenced petitioner. The court sentenced petitioner on each of the two counts
12  to 24 to 60 months together with an equal and consecutive sentence on the weapon
13  enhancement, with the sentences on the two counts to run consecutively. The sentence
14  resulted in a total aggregate sentence of 96 to 240 months. Howard received approximately
15  ten months credit for time served, and the court specified further that the sentences would run
16  concurrently with his sentence on the coercion conviction and with his sentence in a Florida
17  case.[28]

18  The judgment of conviction was entered on December 1, 2003.[29]

19  Howard took a direct appeal through counsel, and he also pursued a *pro se* state post-
20  conviction petition.

21  Any additional factual background pertinent to the individual claims presented is set
22  forth below in the discussion of the respective claims.

23  _____

24  [25]#12, Ex. K, at 6-11; *id.*, Ex. L.

25  [26]#20, Ex. 6.

26  [27]See #12, Ex. M; #20, Ex. 6.

27  [28]#12, Ex. O.

28  [29]#12, Ex. Q.

1

***Governing Law***

2     The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly

3 deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333

4 n. 7, 117 S.Ct. 2059, 2066 n.7,138 L.Ed.2d 481 (1997).  Under this deferential standard of

5 review, a federal court may not grant habeas relief merely on the basis that a state court

6 decision was incorrect or erroneous.  *E.g., Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir.

7 2003).  Instead, under 28 U.S.C. § 2254(d), the federal court may grant habeas relief only if

8 the decision: (1) was either contrary to or involved an unreasonable application of clearly

9 established federal law as determined by the United States Supreme Court; or (2) was based

10 on an unreasonable determination of the facts in light of the evidence presented in the state

11 court.  *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003).

12     A state court decision is "contrary to" law clearly established by the Supreme Court only

13 if it applies a rule that contradicts the governing law set forth in Supreme Court case law or

14 if the decision confronts a set of facts that are materially indistinguishable from a Supreme

15 Court decision and nevertheless arrives at a different result.  *E.g., Mitchell,* 540 U.S. at 15-16,

16 124 S.Ct. at 10.  A state court decision is not contrary to established federal law merely

17 because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Supreme Court has

18 held that a state court need not even be aware of its precedents, so long as neither the

19 reasoning nor the result of its decision contradicts them.  *Id.*  Moreover, "[a] federal court may

20 not overrule a state court for simply holding a view different from its own, when the precedent

21 from [the Supreme] Court is, at best, ambiguous."  *Mitchell*, 540 U.S. at 17, 124 S.Ct. at  11.

22 For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme

23 Court precedent is not contrary to clearly established federal law.

24     A state court decision constitutes an "unreasonable application" of clearly established

25 federal law only if it is demonstrated that the state court's application of Supreme Court

26 precedent to the facts of the case was not only incorrect but "objectively unreasonable."  *E.g.,*

27 *Mitchell*, 540 U.S. at 18,124 S.Ct. at 12; *Davis v. Woodford*, 333 F.3d 982, 990 (9th Cir. 2003).

28     / / / /

1    To the extent that the state court's factual findings are challenged intrinsically based

2  upon evidence in the state court record, the "unreasonable determination of fact" clause of

3  Section 2254(d)(2) controls on federal habeas review.  *E.g., Lambert v. Blodgett*, 393 F.3d

4  943, 972 (9th Cir. 2004).  This clause requires that the federal courts "must be particularly

5  deferential" to state court factual determinations.  *Id*.  The governing standard is not satisfied

6  by a showing merely that the state court finding was "clearly erroneous."  393 F.3d at 973.

7  Rather, the AEDPA requires substantially more deference:

8          . . . . [I]n  concluding that a state-court finding is unsupported by
          substantial evidence in the state-court record, it is not enough that
9          we would reverse in similar circumstances if this were an appeal
          from a district court decision. Rather, we must be convinced that
10         an appellate panel, applying the normal standards of appellate
          review,  could  not  reasonably  conclude  that  the  finding  is
11         supported by the record.

12  *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.  If

13  the state court factual findings withstand intrinsic review under this deferential standard, they

14  then are clothed in a presumption of correctness under 28 U.S.C. § 2254(e)(1); and they may

15  be overturned based on new evidence offered for the first time in federal court, if other

16  procedural prerequisites are met, only on clear and convincing proof.  393 F.3d at 972.

17    The petitioner bears the burden of proving by a preponderance of the evidence that

18  he is entitled to habeas relief.  *Davis*, 333 F.3d at 991.

19                    ***Discussion***

20    ***Ground 1:    Due Process – Alleged Judicial Intervention in Plea Discussions***

21    In Ground 1, petitioner alleges that he was denied due process when the state district

22  court allegedly improperly intervened in the plea negotiations and coerced his plea.

23    As noted, the case came on for a calendar call on June 5, 2003, with the trial set four

24  days later.  The court observed that the pending motions remained to be resolved.  Defense

25  counsel advised the court, however, that Howard was considering a plea offer by the State.[30]

26  _____

27       [30]#12, Ex. K, at 2.  Petitioner at times has suggested in his papers, *e.g.*, #12, Ex. U, at 7, that he was
   in court only for a motion hearing and that the state district judge nonetheless initiated a plea discussion.

28                              (continued...)

                                -10-

At that point, the state trial judge asked counsel what the offer was and engaged in a discussion – with counsel, not directly with petitioner individually – as to what the parameters of the potential plea agreement were.  During the discussion, the judge asked a number of questions as to specifics of the potential agreement, including: "What was the offer made?" "What's the penalty on that?"  "That's what the intent of everything is?"  Also during the discussion, the judge made statements as to the potential exposure without a plea deal if petitioner was found guilty, including: "He could do like 80 years."  "If he doesn't do it you're going to trial and if he's convicted his exposure is about 50 years."  At the end of the discussion, the court stated only: "All right.  He's either going to take the deal or not, Miss Hoffman."  The state judge made no threats as to any action that would be taken by the court. He instead stated what petitioner's exposure would be if he went to trial, statements that often are made during plea colloquies and other routine court appearances.  The judge stated no more than what already should have been obvious to the petitioner four days before trial – he either could take the plea and limit his exposure or go to trial in four days and potentially face the large sentencing exposure available under the applicable statutes.[31]

Petitioner presented no argument, in either the counseled motion to withdraw plea or his own *pro se* motion, that the plea should be withdrawn because of improper participation or coercion by the state trial judge.[32]  However, at the hearing on the motion, Howard addressed the court individually and stated, *inter alia*, referring to the June 5, 2003, proceeding: "You screamed I'm going to do 90 years."  The court rejected Howard's *pro se* allegations that he was manipulated by the court and counsel with the following:

---

[30](...continued)

What the state court record instead reflects is that petitioner was in court for the final calendar call before the jury trial that was set only four days later and that plea discussions then were underway.  While the motions most certainly were on tap for resolution at the calendar call, petitioner's implication that the motions were the only matters under consideration until the state judge began discussing a plea deal is not supported by either the record or reason.

[31]See #12, Ex. K, at 2-5

[32]See #12, Ex. M.

. . . . He was fully aware.  He's suggesting that somebody is trying to manipulate him.  I think he's trying to manipulate the system and get the benefit and not the detriment.  The motion to withdraw is denied.

#12, Ex. O, at 6-9.

On the represented appeal, petitioner presented no claim to the Supreme Court of Nevada that the plea should be withdrawn because of improper participation or coercion by the state trial judge.[33]

In his state post-conviction petition, petitioner presented a due process claim based upon alleged improper participation and coercion by the state trial judge.[34]

The state district court, through the same district judge, found "that Defendant's claim that he was coerced by the Court and his counsel to accept a plea is belied by the record."[35]

On the state post-conviction appeal, the Supreme Court of Nevada addressed only claims of ineffective assistance of counsel.  The state supreme court did not address the merits of any underlying substantive claims, and the court held that all claims other than claims of ineffective assistance of counsel were procedurally barred.[36]

In addressing the ineffective assistance claims, however, the state supreme court made the following findings regarding the trial judge's discussion of the potential plea:

. . . . A review of the record on appeal demonstrates that the district court did not improperly participate in the plea negotiations.  Rather, pursuant to trial counsel's statement that a plea offer had been extended by the State, the district court had the terms of the plea negotiations set forth on the record.  The record does not demonstrate that the district court evinced a desire that appellant accept the offer of the State prior to appellant accepting the plea negotiations. . . . .

#12, Ex. X, Order of Affirmance, at 3 (footnote to "*but cf.*" citation omitted).

_____

[33]See #12, Ex. R.

[34]#12, Ex. U, at 7; *id.*, supporting memorandum, at 3-7.

[35]#12, Ex. V, at 3, ¶ 14.

[36]#12, Ex. X, Order of Affirmance, at 2 n.2.

1    In the federal answer, the respondents do not address the petitioner's underlying

2  substantive due process claim separately from petitioner's ineffective assistance claims.  The

3  Court will assume, *arguendo*, that the respondents have waived any procedural default

4  defense by failing to raise a procedural default defense as to this claim in the answer.[37]

5  Moreover, because the due process claim was not addressed on the merits in the last

6  reasoned decision by the Supreme Court of Nevada, this court reviews the substantive claim

7  under a *de novo* standard of review rather than under the deferential standard of review under

8  the AEDPA,.  *See,e.g., Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005).

9    On *de novo* review, the Court holds that petitioner was not denied due process by the

10  state trial judge's discussion of the potential plea bargain.

11    Howard contends in the federal petition that the federal criminal rule against judicial

12  participation in plea discussions under Rule 11(c)(1) of the Federal Rules of Criminal

13  Procedure should be extended to his case.   He further relies upon Nevada state

14  jurisprudential authority under Nevada state law limiting participation judicial participation in

15  plea discussions.

16    Rule 11(c)(1) states in pertinent part "[t]he court must not participate in [plea]

17  discussions."[38]   However, neither the United States Supreme Court nor any federal court of

18  appeals has held that the prohibition under this federal rule of criminal procedure against

19  judicial participation in plea discussions is compelled by the Due Process Clause.  Rather, to

20  the contrary, the First, Second, Fourth, Fifth, Seventh, Eighth, and Tenth Circuits instead all

21

22    [37]*See,e.g., Morrison v. Mahoney*, 399 F.3d 1042, 1045-47 (9th Cir. 2005)(the procedural default
affirmative defense must be raised in the first responsive pleading in order to avoid waiver, with the answer

23  rather than a motion to dismiss constituting the first responsive pleading); *see also Vang v. Nevada*, 329 F.3d
1069, 1072 (9th Cir. 2003)(instead basing the waiver on the failure to raise the defense in the respondents'

24  motion to dismiss); *but cf. Day v. McDonough*, 547 U.S. 198, 126 S.Ct. 1675, 164 L.Ed.2d 376 (2006)(district
court could *sua sponte* raise timeliness issue, which was an affirmative defense like procedural default, even

25  after the state conceded in its answer that the petition was timely, due to a miscalculation by the state).

26    In future, respondents' counsel shall respond in the answer to each federal claim individually as
opposed to the broad brush consolidated response made in the answer in this case.

27

28    [38]Although petitioner cites the pertinent portion of the rule as Rule 11(e)(1), the paragraphs have
been re-designated subsequent to the case authority relied upon by petitioner.

1  have concluded that a  blanket prohibition against judicial participation in plea discussions is

2  not compelled by the Constitution and therefore does not apply to state criminal trials.[39]

3        Accordingly, for this Court to extend the rule in federal criminal trials prohibiting judicial

4  participation in plea discussions to the States under the Due Process Clause, the Court would

5  have to establish and announce a new rule of constitutional law.  Under *Teague v. Lane*, 489

6  U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), a new constitutional rule of criminal

7  procedure cannot be applied to cases that became final before the new rule was announced.

8  Thus, even if, *arguendo*, this Court otherwise were inclined to hold – contrary to the law

9  applicable in eight of the eleven regional federal circuits – that the Due Process Clause

10  prohibits judicial participation in plea discussions, Howard could not benefit from such a new

11  rule because his conviction became final when the time for seeking *certiorari* from the denial

12  of his direct appeal expired on August 9, 2004.  The Court therefore rejects his claim for relief

13  based upon an alleged blanket prohibition against judicial participation in plea discussions

14  applicable in state criminal trials pursuant to the Due Process Clause.[40]

15        Petitioner's additional reliance upon a Nevada state law prohibition against judicial

16  participation in plea discussions further is misplaced.  A violation of a state criminal procedural

17  rule does not provide a basis for federal habeas relief.  *E.g., Estelle v. McGuire*, 502 U.S. 62,

18  68 n.2, 112 S.Ct. 475, 480 n.2, 116 L.Ed.2d 385 (1991).  *Accord Miles v. Dorsey*, 61 F.3d

19

20  [39]*See Damiano v. Gaughan*, 770 F.2d 1, 2-3 (1st Cir. 1985); *McMahon v. Hodges*, 382 F.3d 284, 289
   n.5 (2nd Cir. 2004); *United States ex rel. Bullock v. Warden, Westfield State Farm for Women*, 408 F.3d 1326,
21  1330 (2nd Cir. 1969); *Brown v. Peyton*, 435 F.2d 1352, 1355-57 (4th Cir. 1970); *Frank v. Blackburn*, 646 F.2d
   873, 880 (5th Cir. 1980)(*en banc*); *Blackmon v. Wainwright*, 608 F.2d 183, 184-85 (5th Cir. 1979); *Flores v.
22  Estelle*, 578 F.2d 80, 85 (5th Cir. 1978); *United States ex rel. Robinson v. Housewright*, 525 F.2d 988, 990-
   991 (7th Cir. 1975); *Toler v. Wyrick*, 563 F.2d 372, 374 (8th Cir. 1977); *Miles v. Dorsey*, 61 F.3d 1459, 1466-67
23  (10th Cir. 1995).  The Fifth Circuit cases cited above also are binding Eleventh Circuit authority because the
   cases predate the split of the former Fifth Circuit into the current Fifth and Eleventh Circuits.  *See Bonner v.
24  City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(*en banc*)(former Fifth Circuit precedent handed down
   prior to October 1, 1981, constitutes binding Eleventh Circuit precedent).  Thus, it is the law of eight of the
25  eleven regional federal circuits that there is no constitutional prohibition against a judge participating in plea
   discussions; and there is no authority from the remaining three circuits to the contrary.  *Accord Caudill v.
26  Jago*, 747 F.2d 1046 (6th Cir. 1984)(state trial judge's participation in plea discussions did not render plea
   involuntary).

27

28  [40]The *Teague* rule can be raised *sua sponte*.  *E.g., Caspari v. Bohlen*, 510 U.S. 383, 389, 114 S.Ct.
   948, 953, 127 L.Ed.2d 236 (1994).

1459, 1467 n.8 (10th Cir. 1995)(violation of New Mexico state rule that tracked the federal rule and prohibited judicial participation in plea discussions did not provide a basis for federal habeas relief).[41]

The Court otherwise is not persuaded that Howard's plea was rendered involuntary by coercion by the state district judge.

At the outset, the state district court found as a fact twice -- once by implication at the hearing on the motion to withdraw plea and once expressly on the state post-conviction petition – that petitioner was not coerced into accepting the plea.   Moreover, the state supreme court found based upon its review of the transcript in question that the state district court did not evince a desire that Howard accept the offer of the State prior to appellant accepting the plea negotiations.  While this federal claim is reviewed *de novo* as to the law, the state courts' factual findings nonetheless are subject to deferential review under the AEDPA.  The state courts' findings based upon the transcript that petitioner was not coerced are supported by substantial evidence and are clothed with a presumption of correctness.[42]

Moreover, even on a fully *de novo* review of fact as well as law, the Court is not persuaded, following an independent review of the relevant transcript, that the state district court coerced petitioner's plea.  Petitioner's subjective perceptions and hyperbole aside, the state district court made no threats.   Petitioner's assertion that the state district judge screamed at him that he would get 90 years is wholly unsupported by the transcript, as the state judge did not even address petitioner directly during the discussion in question.[43]  The

---

[41]The Court further would note in passing that the authority in force at the time that is relied upon by petitioner expressly cautioned against an expansive interpretation of the opinion and stated that "[t]he constitution does not forbid all participation by the judge in the plea negotiation process."  *Standley v. Warden*, 115 Nev. 333, 337-38, 990 P.2d 783, 785 (1999).

[42]Deferential review of state court factual findings extends to implicit as well as explicit findings of fact.  *See,e.g., Wainwright v. Witt*, 469 U.S. 412, 430-31,105 S.Ct. 844, 855-56, 83 L.Ed.2d 841 (1985). Deferential review also applies to  factual findings by state appellate courts as well as to findings by state trial courts.  *See,e.g., Little v. Crawford*, 449 F.3d 1075, 1077 n.1 (9th Cir. 2006).

[43]Petitioner additionally relies upon the following statement by the trial judge:

(continued...)

1  state district judge's discussion with counsel in petitioner's presence of his potential exposure

2  with and without a plea deal was not coercive.  A merely subjective – and, based upon the

3  on-record facts presented here, objectively unreasonable – perception by the petitioner that

4  he was being coerced by the trial judge is insufficient to establish a constitutional deprivation

5  of due process.[44]

6          Petitioner's most significant problem going into a trial was not any statement made by

7  the state district judge about his potential exposure following a conviction but instead was the

8  extensive evidence of guilt against him.  This included being caught on the surveillance

9  videotape at both robberies, solid positive eyewitness identifications of him as the perpetrator

10  at both robberies, corroborative evidence such as being observed driving a truck and wearing

11  clothes matching that of the perpetrator on the day of the second robbery, his twice fleeing

12  from police, and his own unsolicited inculpatory statements, both to the police (if admitted into

13  evidence) as well as to his nephew.

14          / / / /

15

16      [43](...continued)
                I have to do that [referring to having a written guilty plea agreement].
17      If it goes to trial I would do everything, if he wants to take the deal, which I
        think is a fair offer, have him take the deal.  If he doesn't, we go to trial first
18      thing Monday.

19  #12, Ex. K, at 7.  As the Supreme Court of Nevada noted, however, this exchange occurred *after* the parties
20  came back to the courtroom and advised the judge that Howard had accepted the State's plea offer.  See
    #12, Ex. X, Order of Affirmance, at 3.  Whatever the trial court meant by the statement, the statement could
21  not have coerced Howard into entering into a plea deal that he already had accepted.  The statement, after
    all, arose in the context of a discussion of the logistics and timing of having a written guilty plea agreement
22  prepared.  Petitioner's reliance on this statement reflects a patent effort to comb through the transcript after
    the fact for out-of-context statements upon which to construct a claim of coercion, as the plea deal clearly
23  already had been made prior to this statement.

24      [44]*See,e.g., Caudill v. Jago*, 747 F.2d 1046, 1051 & 1052 (6th Cir. 1984)(trial judge did not coerce
    defendant by informing him that he potentially faced the death penalty if he went to trial, and the plea was not
25  rendered involuntary merely because the judge's statements may have raised some fear in the defendant);
    *United States ex rel. Robinson v. Housewright*, 525 F.2d 988, 991-92 (7th Cir. 1975)(voluntariness must be
26  determined based upon objective record facts rather than upon the defendant's recital of his subjective
    mental impressions of being coerced by the trial judge); *see also McMahon v. Hodges*, 382 F.3d 284, 289 n.5
27  (2nd Cir. 2004)(collecting New York state authorities holding that a judge is permitted to discuss the
    sentencing repercussions of going to trial and to remind the defendant of the scope of sentencing available in
28  the event of a conviction).

The Court accordingly holds, on *de novo* review, that petitioner was not denied due process by the state district judge's on-record discussion of his potential plea bargain.

Ground 1 therefore does not provide a basis for federal habeas relief.

**Ground 2:  Effective Assistance of Counsel**

In Ground 2, petitioner alleges, in the main, that he was denied effective assistance of counsel when counsel failed to pursue his *pro se* request for a continuance to contact more witnesses for trial, allegedly coerced and manipulated him into accepting a plea, and failed to interview petitioner's witnesses, conduct any legal research, or review any records.

On a claim of ineffective assistance of counsel, the petitioner must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice.  On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time.  The reviewing court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct.  On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

**Failure to Pursue the Pro Se Continuance Request**

After the discussion addressed above under Ground 1, at the Thursday calendar call before the Monday trial, the following exchange occurred with regard to a *pro se* request for a continuance by Howard:

|                 |                                                              |
|-----------------|--------------------------------------------------------------|
| THE COURT:      | All right.  He's either going to take the deal or not Ms. Hoffman. |
|                 | Do you [to Howard] want to say something?                    |
| [DEFENDANT]:    | I was going to ask for adjournment to get some more witnesses together. |
| THE COURT:      | On what?                                                     |

-17-

| | |
|---|---|
| [DEFENDANT]: | As far as the robbery case, the Wendy's robbery. |
| THE COURT: | What is he asking me, a motion to continue? |
| MS. HOFFMAN: | He would like a continuance.  The reason I'm having Mr. Howard state this is I don't know of a legal basis because I'm not familiar with the witnesses that he's referring to.  But I know in speaking to him about the negotiation, he said he wanted some more time, he thought there might be more witnesses and I wanted him to at least be able to put that forth in front of the Court. |
| THE COURT: | You know, Mr. Howard, I'm not going to continue this case.  There's apparently not a good, valid reason to do that. |
| MS. HOFFMAN: | I don't know if that's correct, I'm just not aware of it. |
| MR. PETERSON: | The State's ready to go. |
| THE COURT: | The motion to continue is denied.  You want me to be quick about it.  You're either going to negotiate it or it's going to trial first thing Monday.  It's as simple as that.  Now [to counsel] you want to proceed with these motions? |

#12, Ex. K, at 5-6.

    In his state post-conviction petition, Howard alleged that his trial counsel had been
ineffective for failing to pursue his *pro se* motion for a continuance.  He did not identify any
witnesses that he would have called or the content of their testimony, and he did not attach
any affidavits by any such witnesses.[45]

    On the post-conviction appeal, the Supreme Court of Nevada rejected the claim on the
following grounds:

            . . . [A]ppellant claimed that his trial counsel was ineffective
    for failing to provide adequate representation when appellant
    provided "new information witnesses [sp]."  Appellant claimed that
    these witnesses would establish his innocence.  We conclude
    that appellant failed to demonstrate that his trial counsel's
    performance was deficient or that he was prejudiced.  Appellant

---

[45]#12, Ex. U, at 8; *id.*, supporting memorandum, at 8-13.

-18-

> failed to identify the witnesses or provide specific information about the potential testimony of these witnesses. Therefore, we conclude that the district court did not err in determining that this claim lacked merit.

#12, Ex. X, Order of Affirmance, at 4 (citation footnote omitted).

The Nevada Supreme Court's decision was neither contrary to nor an unreasonable application of clearly established federal law. Under Nevada state post-conviction practice, a petitioner must attach affidavits, records or other evidence supporting the factual allegations of the petition, and he may not present merely an unsubstantiated claim. *See* N.R.S. 34.370(4). It was not an objectively unreasonable application of *Strickland* for the Supreme Court of Nevada to reject this wholly unsubstantiated claim, in which petitioner tendered absolutely no evidence as to the identity or content of any witness' testimony.

Moreover, petitioner's core underlying legal premise on this claim is flawed. Petitioner maintains that trial counsel should have argued to the state court on the continuance request that he had a right to call witnesses and present a defense. He urges that counsel's statements that "I don't know of a legal basis" and "I don't know if that's correct, I'm just not aware of it" reflected her ignorance of these fundamental constitutional rights. The rights to call witnesses and present a defense, however, do not entitle a criminal defendant to obtain a continuance four days before a trial based upon merely on an assertion by the defendant that he has "witnesses" that he has not even identified to either his defense counsel or the trial court.[46] The foregoing statements by counsel appear to reflect her recognition that there was no legal basis for a motion for a continuance based simply upon a defense request four days before trial "to get some more witnesses together" and that she was just not aware of

---

[46]*See, e.g., Morris v. Slappy*, 461 U.S. 1, 11-12, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983); *Ungar v. Sarafite*, 376 U.S. 575, 589-90, 84 S.Ct. 841, 849-50, 11 L.Ed.2d 921 (1964)("The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel."). Petitioner further arguably presents an independent substantive claim based upon the trial court's denial of a continuance. See #5, at 10, lines 17-21. The Nevada Supreme Court held that all independent substantive claims were procedurally barred. #12, Ex. X, Order of Affirmance, at 2 n.2. Respondents, however, arguably have waived any procedural default defense by failing to assert same in their answer. On *de novo* review, this Court holds that petitioner is not entitled to relief on this independent substantive claim. The state trial court did not commit constitutional error by denying a continuance in the circumstances described in the text.

-19-

1    a valid reason for a continuance given that petitioner had not identified any specific witnesses

2    or the content of their testimony.  Counsel in any event did not provide deficient performance

3    by failing to explicitly invoke these constitutional arguments upon such a nonexistent factual

4    showing in support of a continuance.   Nor did petitioner present evidence to the state courts

5    that he was prejudiced as a result.

6          The state high court's rejection of this claim accordingly was neither contrary to nor an

7    unreasonable application of clearly established federal law.

8          This claim of ineffective assistance does not provide a basis for federal habeas relief.

9          ***Alleged Coercion by Counsel***

10         Petitioner entered a guilty plea at the June 5, 2003, calendar call discussed above, four

11   days before trial.  After the discussion at the calendar call addressed under Ground 1 and on

12   the above claim of ineffective assistance, the court took a recess so that the State could

13   confer with its motion witnesses and also apparently so that defense counsel could confer

14   with Howard.  After the recess, defense counsel and Howard advised the court that he had

15   accepted a plea deal.  The court waited for the parties to prepare a written plea agreement,

16   in which Howard affirmed that he was not acting under duress or coercion.  Thereafter, In the

17   plea colloquy, Howard affirmed that he was acting voluntarily, that he had signed the plea

18   agreement, and that he had read and understood the agreement.[47]

19         The motion to withdraw plea filed by different counsel did not include a claim that the

20   plea should be withdrawn due to coercion by trial counsel.  Howard individually maintained

21   at the hearing, however, that counsel had coerced and manipulated into taking the plea:

22
          THE COURT:          . . . .  What do you want to say to me, Mr.
23                                      Howard?

24        [DEFENDANT]:         Your Honor, upon the plea negotiations, I
                               was here to hear a motion of bad acts.
25                             That's what the purpose was to be in Court
                               that day.  Then all of a sudden all of this
26                             manipulation came around.

27   _____

28        [47]#12, Ex. K, at 6- 10; *id.*, Ex. L, at 4.

                                          -20-

|   |   |
|---|---|
| | As far as this guilty plea, my Public Defender at the time coerced and manipulated me into taking that plea, acknowledged to me that I'm going to lose at trial, I'm gonna this, I'm gonna that, you know what I'm saying. I was – my fiancee was out there. My son was out there. Wasn't nobody else in the courtroom. You screamed I'm going to do 90 years. |
| | I was manipulated and coerced into taking that plea when I wanted to go to trial because I'm not guilty of no robbery with no use of a deadly weapon, Your Honor. I'm really not. |
| THE COURT: | The what the hell did you plead to it for? |
| [DEFENDANT]: | Because I was coerced --. |
| THE COURT: | Who coerced your? Everything was in open Court. I didn't see anybody put a gun to your head. You signed the guilty plea agreement. |
| [DEFENDANT]: | She wasn't going to represent me properly. She – she – she acknowledged it to me. She wasn't going to represent me properly. She kept saying, do you want to lose? You wanna this? You wanna that? I'm like, you know what I mean – |

#12, Ex. O, at 6-7. As discussed under Ground 1, the state district court rejected Howard's claim that he had been manipulated by the court and defense counsel.[48]

In his state petition, Howard alleged that he was denied effective assistance because his trial counsel allegedly coerced and manipulated him into accepting a plea. He asserted that counsel coerced his wife and son into begging him to take the plea deal by telling them that he would go to prison for fifty to ninety years without a deal. He alleged that he accepted the deal after an extremely emotional scene. He alleged no further specifics as to how counsel allegedly coerced his plea. #12, Ex. U, at 8; *id.*, supporting memorandum, at 9-10.

---

[48]Petitioner's suggestion that he was in court only for a motion hearing when "all of a sudden" plea discussions broke out is belied by the record. Plea negotiations already were under way. See note 30, *supra*. Petitioner further suggests that defense counsel's alleged coercion of him made her feel sick. The statement by counsel upon which he relies, however, does not necessarily signify that counsel was sick due to the plea negotiations as opposed to merely being under the weather that day. See #12, Ex. K, at 7.

1       On the state post-conviction appeal, the Supreme Court of Nevada did not address this

2   claim.   The court addressed the petitioner's claim that trial and appellate counsel were

3   ineffective for failing to challenge the district court's participation in the plea negotiations and

4   alleged coercion of petitioner.   The court did not address, however, the separate claim of

5   coercion by trial counsel.[49]   Because the claim was not addressed on the merits in the last

6   reasoned decision by the Supreme Court of Nevada, this court reviews the substantive claim

7   under a *de novo* standard of review rather than under the deferential standard of review under

8   the AEDPA,.   *See,e.g., Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005).   The Court

9   notes, however, that the state district court found that petitioner's claims that he was coerced

10  by the court and counsel to accept a plea were belied by the record.[50]

11      In *Blackledge v. Allison*, 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977), the

12  Supreme Court stated:

13

14              . . . . [T]he representations of the defendant, his lawyer,
        and the prosecutor at . . . a [plea] hearing, as well as any findings
15      made by the judge accepting the plea, constitute a formidable
        barrier in any subsequent collateral proceedings.   Solemn
        declarations in open court carry a strong presumption of verity.
16      The   subsequent   presentation   of   conclusory   allegations
        unsupported by specifics is subject to summary dismissal, as are
17      contentions that in the face of the record are wholly incredible.

18  431 U.S. at 73-74, 97 S.Ct. at 1629.   The *Blackledge* Court observed that "a petitioner

19  challenging a plea given pursuant to procedures [similar to those employed by the state court

20  in this case] will necessarily be asserting that not only his own transcribed responses, but

21  those given by two lawyers, were untruthful."   431 U.S. at 80 n.19, 97 S.Ct. at 1632 n. 19.

22  Under *Blackledge*, a collateral attack that directly contradicts the responses at the plea

23  proceedings "will entitle a petitioner to an evidentiary hearing only in the most extraordinary

24  circumstances."   *Id*.

25      / / / /

26

27      [49]#12, Ex. X, Order of Affirmance.

28      [50]#12, Ex. V, at 3, ¶ 14.

1    In the present case, petitioner declared in the guilty plea agreement and/or plea
2    colloquy that he was acting voluntarily, that he had not been coerced, and that he had read,
3    understood, and signed what was said in the plea agreement.  This case does not present
4    the extraordinary circumstances referenced in *Blackledge* that would be necessary for an
5    evidentiary hearing either in federal or state court seeking to overcome these declarations in
6    the plea colloquy.   Pressure, even strong pressure, from defense counsel and family
7    members to plead guilty based upon the strong probability that the defendant will be convicted
8    and then serve a substantial sentence does not constitute unconstitutional coercion that
9    undermines the voluntariness of a guilty plea.[51]

10    What petitioner alleges that his counsel and family told him in order to "coerce" him into
11    entering a plea was exactly the situation that he in fact faced.  He could take the deal and
12    reduce his exposure or he instead could go to a trial where there was a substantial probability
13    that he would be found guilty and then face greater exposure at sentencing.   Petitioner
14    maintained later – after the pressure of an imminent trial date had been removed – that he
15    instead had wanted to go to trial.  The situation that he faced four days before trial, however,
16    based upon the strong evidence against him, was an almost certain conviction and lengthy
17    sentence.  It was not unconstitutional coercion for counsel and family members to state this
18    obvious reality and to strongly urge him to make a quite intelligent decision to accept the plea
19    deal.   The situation may have been an extremely emotional one but it was not one that
20    undermined the voluntariness of the plea.   There is no constitutional requirement that
21    pleading guilty to criminal offenses be an emotionless event where neither defense counsel
22    nor family members strongly urge the defendant to accept the plea offered.  *Accord Miles v.*
23    *Dorsey*, 61 F.3d 1459, 1470 (10th Cir. 1995)("Although deadlines, mental anguish, depression,

---

25    [51]*See,e.g., Iaea v. Sunn*, 800 F.2d 861, 867 (9th Cir. 1985)("Mere advice or strong urging by third
    parties [*i.e.*, other than the court or the prosecutor] to plead guilty based on the strength of the state's case
26    does not constitute undue coercion."); *accord Miles v. Dorsey*, 61 F.3d 1459, 1470 (10th Cir.1995)(an
    attorney's attempt "to persuade Petitioner that it was in his best interest to plea does not lead to the
27    conclusion that his" plea was involuntary); *Brown v. LaValle*, 424 F.2d 457, 461 (2d Cir.1970) ( statements
    encouraging a defendant to accept a guilty plea  were not unconstitutionally coercive when made by the
28    defendant's mother and counsel).

1   and stress are inevitable hallmarks of pretrial plea discussions, such factors considered

2   individually or in aggregate do not establish that Petitioner's plea was involuntary.").

3        On *de novo* review, the Court accordingly holds that this ineffective assistance claim

4   does not provide a basis for federal habeas relief.

5                ***Alleged Failure to Interview Witnesses, Research and Review Records***

6        Petitioner alleges that he was denied effective assistance of counsel when trial counsel

7   allegedly failed to interview petitioner's witnesses, conduct any legal research, or review any

8   records.

9        Petitioner provided no specifics supporting this claim in the state courts.  The claim

10  does not even appear within petitioner's state post-conviction petition as opposed to the

11  supporting memorandum.  The Supreme Court of Nevada did not explicitly address the claim

12  over and above its rejection – for lack of specifics – of petitioner's claim, discussed above,

13  with regard to the unspecified witnesses vis-à-vis his continuance request.[52]

14       The Supreme Court decisions in *Tollett v. Henderson*, 411 U.S. 258, 93 S.Ct. 1602,

15  36 L.Ed.2d 235 (1973), and *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203

16  (1985), sharply curtail the possible grounds available for challenging a conviction entered

17  following a guilty plea based upon alleged errors occurring prior to the plea proceedings.  As

18  the Court stated in *Tollett*:

19

20              . . . .  [A] guilty plea represents a break in the chain of
        events which has preceded it in the criminal process.  When a
21      criminal defendant has solemnly admitted in open court that he
        is in fact guilty of the offense with which he is charged, he may
22      not thereafter raise independent claims relating to the deprivation
        of constitutional rights that occurred prior to the entry of the guilty
23      plea.  He may only attack the voluntary and intelligent character
        of the guilty plea by showing that the advice he received from
24      counsel was not within the [constitutional] standards [established
        for effective assistance of counsel.]

25  411 U.S. at 267, 93 S.Ct. at 1608.   Accordingly, "while claims of prior constitutional

26

27  _____

28      [52]#12, Ex. U, at 8; *id.*, supporting memorandum, at 10-12; #12, Ex. W, at 6; *id.*, Ex. X, Order of
    Affirmance, at 4.

-24-

deprivation may play a part in evaluating the advice rendered by counsel, they are not themselves independent grounds for federal collateral relief." *Id.*

In *Hill*, the Supreme Court held that the previously-described *Strickland* standard applies to challenges to guilty pleas based on alleged ineffective assistance of counsel. 474 U.S. at 58, 106 S.Ct. at 370. Further, with particular regard to the prejudice prong of the *Strickland* standard, the petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59, 106 S.Ct. at 370. As the Supreme Court observed:

> . . . . For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial. . . . . As we explained in *Strickland v. Washington, supra*, these predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the "idiosyncrasies of the particular decisionmaker." Id., 466 U.S., at 695, 104 S.Ct., at 2068.

474 U.S. at 59-60, 106 S.Ct. at 370-71. Thus, an attorney's unprofessional error in failing to develop a meritorious defense may serve as a basis for overturning a guilty plea and conviction only if, viewed objectively, there is a reasonable probability that, but for the error, the petitioner would not have pled guilty and would have insisted on going to trial.

Petitioner's conclusory allegations in the state and federal courts that his counsel failed to interview unspecified witnesses, failed to conduct unspecified research, and failed to review unspecified records fails to assert a sufficiently specific claim for habeas relief under Rule 2 of the Rules Governing Section 2254 Cases..

On *de novo* review, the Court accordingly holds that this conclusory ineffective assistance claim fails to provide a basis for federal habeas relief.

/ / / /

-25-

***Ground 3: Allegedly Inadequate Guilty Plea Canvass***

In Ground 3, petitioner alleges that he was denied due process and effective assistance of counsel when the state district court allegedly did not canvass him properly during the plea colloquy.  He alleges, in particular, that the canvass was inadequate because the court did not ask him during the plea colloquy whether he understood the constitutional rights that he was waiving by the plea.

In the counseled motion to withdraw the guilty plea, petitioner contended, *inter alia*, that the record did not adequately show that Howard understood the elements or nature of the offenses to which he pled guilty.[53]  On direct appeal, the Supreme Court of Nevada rejected these claims on the merits.[54]  Petitioner did not claim either in the motion or on direct appeal that the canvass was inadequate because the state trial court did not ask him during the plea colloquy whether he understood the constitutional rights that he was waiving by the plea.

On state post-conviction review, petitioner asserted only a conclusory claim that "the defendant was not canvassed properly by Judge Bonaventure."  The memorandum supporting the petition did not elaborate further as to this particular claim.  No claim of ineffective assistance of counsel was presented in this regard.[55]

The state district court held that any further challenge to the plea was barred by law of the case.[56]

On the post-conviction appeal, petitioner made no argument that the canvass was inadequate on the basis that the state trial court did not ask him during the plea colloquy whether he understood the constitutional rights that he was waiving by the plea.  Nor did he argue ineffective assistance of counsel in this regard.  #12, Ex. W.

---

[53]#12, Ex. M, at 4-5.  Petitioner's earlier *pro se* motion to withdraw plea had not challenged the adequacy of the plea canvass in any respect.  See #20, Ex. 6.

[54]#12, Ex. T, at 1-3.

[55]#12, Ex. U, at 11; *id.*, supporting memorandum.

[56]#12, Ex. V, at 3.

-26-

On the post-conviction appeal, the Supreme Court of Nevada held as follows:

> Finally, appellant challenged his guilty plea on the basis that he was not properly canvassed. This court considered and rejected appellant's challenge to the validity of his guilty plea on the basis that he was not properly canvassed. The doctrine of the law of the case prevents further litigation of this issue and cannot be avoided by a more detailed and precisely focused argument. Therefore, we conclude that the district court did not err in denying this claim.

#12, Ex. X, Order of Affirmance, at 4-5 (citation footnote omitted).

In the federal petition, Howard claimed, for the first time in his pleading of claims, that the canvass was inadequate on the ground that the state trial court did not ask him during the plea colloquy whether he understood the constitutional rights that he was waiving by the plea. He also alleged, for the first time in his pleading of claims, that he was denied effective assistance of counsel in this regard.

The respondents have raised neither an exhaustion nor a procedural default defense to Ground 3.

The Court in any event holds, on *de novo* review, that Ground 3 clearly lacks merit under well-established law. The written guilty plea agreement in this case clearly informed Howard – under the heading "WAIVER OF RIGHTS" – of the specific constitutional rights that he was waiving by pleading guilty.[57] The state district court confirmed during the plea canvass that Howard had read, understood, and signed the plea agreement.[58] The Ninth Circuit held, long before deferential AEDPA review, that the state courts are not required by due process to have a defendant specifically articulate the waiver of constitutional rights on the record during the plea colloquy. *See Wilkins v. Erickson*, 505 F2d 761, 763 (9th Cir. 1974).

Moreover, neither trial nor appellate counsel were ineffective for failing to challenge Howard's 2003 plea on this basis. The Supreme Court of Nevada held in 2000, over two years prior to Howard's 2003 plea, that Nevada state courts were not required to have a

---

[57]#12, Ex. L, at 3-4.

[58]#12, Ex. K, at 9.

1   defendant specifically articulate the waiver of constitutional rights on the record during the

2   plea colloquy. *See State v. Freese*, 116 Nev. 1097, 1104-08, 13 P.3d 442, 447-49 (2000).

3   The principal case relied upon by petitioner for the contrary position, *Kidder v. State*, 113 Nev.

4   341, 934 P.2d 254 (1997), was expressly disapproved by the state high court in *Freese*.  116

5   Nev. at 1106 n.7, 13 P.2d at 448 n.7.  The remaining case relied upon by Howard, *Bryant v.*

6   *State*, 102 Nev. 268, 721 P.2d 364 (1986), does not support his argument and indeed was

7   relied upon by the Supreme Court of Nevada in *Freese* in rejecting the argument now made

8   by Howard.   116 Nev. at 1104, 13 P.3d at 447.   Neither trial nor appellate counsel were

9   ineffective for failing to present a challenge to the adequacy of the plea colloquy on a basis

10   that plainly lacked merit under then-applicable Ninth Circuit and Nevada Supreme Court

11   precedent.

12         Ground 3 therefore does not provide a basis for federal habeas relief.

13         IT THEREFORE IS ORDERED that the petition for a writ of habeas corpus, as

14   amended, shall be DENIED on the merits and that the petition shall be DISMISSED with

15   prejudice.  The Clerk of Court shall enter final judgment accordingly in favor of respondents

16   and against petitioner, dismissing the petition with prejudice.

17         DATED:      June 4, 2008

18

19

20                         _____

21                         ROBERT C. JONES
                           United States District Judge

22

23

24

25

26

27

28   (gsk-p3)